UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

JASON McDERMOTT,

               Plaintiff,

   v.

MATTHEW VALLEY, KIM MILLER,
DIANE KAUFMAN, LINDA GHERKE,
JAN EPP, DR. BUNT, BRUCE
COOPER, DR. PETERSON, DR.
BENTLY,

              Defendants.

Case No. 3:11-cv-00331-BLW

**MEMORANDUM DECISION AND
ORDER**

     Pending before the Court are several motions ripe for adjudication (Dkt. 29, 33,

34, 37), including Defendants' Motion for Summary Judgment. (Dkt. 35.) Having

reviewed the parties' briefing, as well as the record in this matter, the Court concludes

that oral argument is unnecessary. Accordingly, the Court enters the following Order

granting Defendants' Motion for Summary Judgment and dismissing this case with

prejudice.

## MOTION FOR SUMMARY JUDGMENT

In his Complaint, filed on July 22, 2011, Plaintiff alleges that Defendants were deliberately indifferent to his serious medical needs by failing to provide him with an effective medication for his constipation condition in 2010 and 2011, when he was housed at the Idaho Maximum Security Institution (IMSI) and the Idaho Correctional Institution in Orofino (ICI-O). (Complaint, Dkt. 3; Plaintiff's SOF, pp. 1-2.) Defendants assert entitlement to summary judgment based on the entire record before the Court.

## 1.    Standard of Law

### A.    *Summary Judgment*

Summary judgment is appropriate where a party can show that, as to any claim or defense, "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.56(a). One of the principal purposes of the summary judgment "is to isolate and dispose of factually unsupported claims . . . ." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). It is "not a disfavored procedural shortcut," but is instead the "principal tool[] by which factually insufficient claims or defenses [can] be isolated and prevented from going to trial with the attendant unwarranted consumption of public and private resources." *Id*. at 327.

"[T]he mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 247-48 (1986). The requirement is that there be no genuine dispute as to any *material* fact. "Material facts are those that may affect the

outcome of the case." *See id.* at 248. The moving party is entitled to summary judgment if

that party shows that each material issue of fact cannot be disputed. To show that the

material facts are not in dispute, a party may cite to particular parts of materials in the

record, or show that the materials cited do not establish the presence of a genuine dispute,

or that the adverse party is unable to produce admissible evidence to support the fact. Fed.

R. Civ. P.56(c)(1)(A)&(B); *see T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*,

809 F.2d 626, 630 (9th Cir. 1987) (citing *Celotex*, 477 U.S. at 322). The Court must

consider "the cited materials," but it may also consider "other materials in the record."

Fed. R. Civ. P.56(c)(3).

Material used to support or dispute a fact must be "presented in a form that would

be admissible in evidence." Fed. R. Civ. P.56(c)(2). Affidavits or declarations submitted

in support of or in opposition to a motion "must be made on personal knowledge, set out

facts that would be admissible in evidence, and show that the affiant or declarant is

competent to testify on the matters stated." Fed. R. Civ. P.56(c)(4).

The Court does not determine the credibility of affiants or weigh the evidence set

forth by the non-moving party. The evidence of the opposing party is to be believed,

*Anderson*, 477 U.S. at 255, and all reasonable inferences which can be drawn from the

evidence must be drawn in a light most favorable to the nonmoving party. *T.W. Elec.

Serv.*, 809 F.2d at 630-31 (internal citation omitted). If the moving party meets its initial

responsibility, the burden then shifts to the opposing party to establish that a genuine

issue (dispute) as to any material fact actually does exist. *Matsushita Elec. Indus. Co. v.*

*Zenith Radio Corp*., 475 U.S. 574, 586 (1986).

The existence of a scintilla of evidence in support of the non-moving party's position is insufficient. Rather, "there must be evidence on which the jury could reasonably find for the [non-moving party]." *Anderson*, 477 U.S. at 252. Rule 56(e)(3) authorizes the Court to grant summary judgment for the moving party "if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." Fed. R. Civ. P.56(e)(3).

**B.** **Section 1983 Claims**

Plaintiff brings his claims under 42 U.S.C. § 1983, the civil rights statute. To state a claim under § 1983, Plaintiff must show the existence of four elements: "(1) a violation of rights protected by the Constitution or created by federal statute (2) proximately caused (3) by conduct of a 'person' (4) acting under color of state law." *Crumpton v. Gates*, 947 F.2d 1418, 1420 (9th Cir. 1991). Section 1983 is "'not itself a source of substantive rights,' but merely provides 'a method for vindicating federal rights elsewhere conferred.'" *Graham v. Connor*, 490 U.S. 386, 393-94 (1989) (quoting *Baker v. McCollan*, 443 U.S. 137, 144 n.3 (1979)).

"Liability under section 1983 arises only upon a showing of personal participation by the defendant." *Taylor v. List*, 880 F.2d 1040, 1045 (9th Cir. 1989) (citation omitted). In other words, Plaintiff must show that Defendants' actions caused the deprivation of a constitutional right. 42 U.S.C. § 1983*; Arnold v. International Business Machines Corp*., 637 F.2d 1350, 1355 (9th Cir. 1981). "The causation requirement of § 1983 . . . is not

satisfied by a showing of mere causation in fact[;] [r]ather, the plaintiff must establish

proximate or legal causation." *Id*. The United States Court of Appeals for the Ninth

Circuit has explained: "A person 'subjects' another to the deprivation of a constitutional

right, within the meaning of § 1983, if he does an affirmative act, participates in another's

affirmative acts, or omits to perform an act which he is legally required to do that causes

the deprivations of which he complains." *Id*. (internal citation omitted).

### C. *Eighth Amendment Claims of Inadequate Medical Care*

To state a claim under the Eighth Amendment, Plaintiff must show that he is

incarcerated "under conditions posing a substantial risk of serious harm," or that he has

been deprived of "the minimal civilized measure of life's necessities." *Farmer v.*

*Brennan*, 511 U.S. 825, 834 (1994) (internal citation omitted). An Eighth Amendment

claim requires a plaintiff to satisfy "both an objective standard—that the deprivation was

serious enough to constitute cruel and unusual punishment—and a subjective standard—

deliberate indifference." *Snow v. McDaniel*, 681 F.3d 978, 985 (9th Cir. 2012).

Regarding the objective standard for prisoners' medical care claims, the Supreme

Court of the United States has explained that "[b]ecause society does not expect that

prisoners will have unqualified access to health care, deliberate indifference to medical

needs amounts to an Eighth Amendment violation only if those needs are 'serious.'"

*Hudson v. McMillian*, 503 U.S. 1, 9 (1992).

The Ninth Circuit has defined a "serious medical need" in the following ways:

failure to treat a prisoner's condition [that] could result in

> further significant injury or the unnecessary and wanton
> infliction of pain[;] . . . [t]he existence of an injury that a
> reasonable doctor or patient would find important and worthy
> of comment or treatment; the presence of a medical condition
> that significantly affects an individual's daily activities; or the
> existence of chronic and substantial pain . . . .

*McGuckin v. Smith,* 974 F.2d 1050, 1059-60 (9th Cir. 1992) (internal citations omitted),

*overruled on other grounds*, *WMX Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997)

(en banc).

As to the subjective standard, a prison official acts with "deliberate indifference . . . only if the [prison official] knows of and disregards an excessive risk to inmate health and safety." *Gibson v. Cnty. of Washoe, Nev.,* 290 F.3d 1175, 1187 (9th Cir. 2002) (citation and internal quotation marks omitted). "Under this standard, the prison official must not only 'be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'" *Toguchi v. Chung*, 391 F.3d 1051, 1057 (9th Cir. 2004) (quoting *Farmer*, 511 U.S. at 837). "If a [prison official] should have been aware of the risk, but was not, then the [official] has not violated the Eighth Amendment, no matter how severe the risk." *Gibson*, 290 F.3d at 1188 (citation omitted). Nonetheless, "whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence, . . . and a factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842; *see also Lolli v. County of Orange*, 351 F.3d

410, 421 (9th Cir. 2003) (deliberate indifference to medical needs may be shown by circumstantial evidence when the facts are sufficient to demonstrate that defendant actually knew of a risk of harm).

Differences in judgment between an inmate and prison medical personnel regarding appropriate medical diagnosis and treatment are not enough to establish a deliberate indifference claim. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989). "[T]o prevail on a claim involving choices between alternative courses of treatment, a prisoner must show that the chosen course of treatment 'was medically unacceptable under the circumstances,' and was chosen 'in conscious disregard of an excessive risk' to the prisoner's health." *Toguchi,* 391 F.3d at 1058 (alteration omitted) (quoting *Jackson v. McIntosh*, 90 F.3d 330, 332 (9th Cir. 1996)).

Mere indifference, medical malpractice, or negligence will not support a cause of action under the Eighth Amendment. *Broughton v. Cutter Labs.*, 622 F.2d 458, 460 (9th Cir. 1980) (per curiam). Nor does the Eighth Amendment provide a right to a specific treatment. *See Forbes v. Edgar*, 112 F.3d 262, 267 (7th Cir. 1997) ("[The plaintiff] is not entitled to demand specific care. She is not entitled to the best care possible. She is entitled to reasonable measures to meet a substantial risk of serious harm to her."). Finally, a mere delay in treatment does not constitute a violation of the Eighth Amendment unless the delay causes further harm. *McGuckin*, 974 F.2d at 1060.

## 2.    Undisputed Facts

This section is a chronology of factual allegations that are undisputed and material to the resolution of the issues in this case. The Court has included the content in the medical and prison records provided by the parties. Where Plaintiff contests what is contained in the medical records, the Court has used his version of events for summary judgment purposes, except where Plaintiff's version of the facts is implausible, clearly refuted by other evidence in the record, or self-contradictory. This section is not intended to be a perfect reflection of Plaintiff's course of treatment, given the extensive records and briefing submitted in this case, but it is sufficient to cover the facts material to determine whether Plaintiff had a serious medical need and whether Defendants were deliberately indifferent to that need.

| | |
|---|---|
| Dec. 5, 2001 | As background information, Plaintiff has provided medical records showing that he suffered a traumatic brain injury (TBI) from a gunshot wound. A PET scan of January 27, 2005, led Dr. Monte S. Buschbaum to conclude that Plaintiff had suffered a major brain injury. (Dkt. 39-5, p. 25.) Plaintiff admits that sometimes his "timeline is off, and that his confusion of the time is due to his traumatic brain injury (which area that was affected was the sensory and memory lobes). (Dkt. 23, p. 7.) |
| about March 2010 | Defendant Physician's Assistant (PA) Matthew Valley prescribed Bentyl for Plaintiff's constipation problems at IMSI. (*See* Dkt. 39-3.) |
| March 21, 2010 | Plaintiff wrote an Offender Concern Form (OCF) and said that the blue pills gave him nausea and a coppery aftertaste, that he thought he was allergic to it, and that he would not take it any more. (Dkt. 39-3, p. 3.) |
| March 24, 2010 | Plaintiff submitted an OCF, stating: |

So, since your little blue pills made me debilitatively nauseous, would you care to try something else? Ooh, I know; do you prescribe benefiber? Something fibery that isn't Fiberlax? Or, if not how about some Purina puppy chow? Or cat mix? I heard that stuff works – I used to eat it on the streets. The dog food would probably be cheaper for the company you work for. You should suggest it. (Dkt. 39-3, p. 2.)

In response, PA Valley stopped the Bentyl and advised Plaintiff to submit a Health Services Request Form (HSR) if he wanted to be seen for constipation again. (Dkt. 39-3, pp. 2-3.)

April 5, 2010      Plaintiff sent in the following OCF, complaining about Defendant Correctional Medical Specialist (CMS) Bruce Cooper:

Let me see if I can describe my feelings about Mr. Cooper in a way that you'll start paying attention when I say I dislike him: I would rather have a cheese grater rubbed across my scalp; or have my fingernails ripped off with rusted tweezers; or my teeth pulled without novocaine's numbing magic; than to speak with Mr. Cooper over anything concerning my medical problems. I thought I was clear about that when I called him a jack-ass, a dick and some other colorful words. His attitude is something of a sort indescribable by few words, and it is apparent upon speaking to him, that he doesn't understand English. Therefore, anytime you send him to speak with me, I will respectfully decline. (Unless he persists, in which case I won't be so respectful.) Thank you. (Dkt. 39-5, p. 32.)

The response from Dr. Dawson was: "You have the right to refuse any medical care. The policy is for medical staff, like CMS Cooper, to triage any HSR's and respond to emergencies, so he may come to offer you assistance as part of his job." (*Id*.)

April 30, 2010      Plaintiff submitted an OCF to PA Valley: "Where did you get your medical license?" Plaintiff said he was going to check everything Valley told him. He disagreed with Valley's statement that one bowel movement a week could be considered normal. (Dkt. 39-3, p. 3.)

May 3, 2010      Plaintiff submitted an OCF to PA Valley and said he had suffered from the constipation problem for several years and thought he could

have something more serious. He wanted to write to CMS headquarters to ask why Metamucil was not on the formulary list any more. (Dkt. 39-3, p. 2.)

August 23, 2010    Plaintiff had an appointment with PA Valley, who evaluated Plaintiff for bowel movement complaints. (York Affidavit, Dkt. 21, ¶ 5; Valley Aff. ¶ 6.) Plaintiff reported that he had a bowel movement every one to two weeks. He told Valley the following medications had not worked for his bowel issues: Fibernorm (a bulk forming laxative), Colace (a stool softener), Bentyl (an anticholinergic used to treat irritable bowel syndrome), and Dulcolax (a stimulant laxative), and that Metamucil (psyllium, a bulk forming laxative) was the only thing that worked for him. PA Valley ordered Lactulose (an osmotic laxative) for Plaintiff to try, but Plaintiff was concerned about this product, pointing out that when laxatives are used continuously they would cause the bowels to become lazy or dependent on laxatives. (*Id.*) Valley interpreted this information from Plaintiff as a refusal and instructed Plaintiff that he believed Lactulose would help him and to submit an HSR if he changed his mind. (*Id.*)

Sept. 13. 2010    Plaintiff submitted a Grievance (No. IM 100000609), saying that he would try Lactulose, but that it was meant for only temporary use, and complaining that IMSI staff would not provide him with Metamucil. (Dkt.39- 3, pp. 6-7.) In the appeal, he requested only Metamucil, saying he had tried everything else. (*Id.*, p. 13.) At this time, Plaintiff was on a medical diet in partial connection to ongoing constipation issues.

October 14, 2010    Plaintiff was transferred to ICI-O. (York Aff., Dkt. 21, p. 4.)

October 25, 2010    Plaintiff was evaluated by Nurse Practitioner (NP) Rory York at ICI-O for complaints of chronic constipation. York prescribed "calcium polycarb tablets – Fibernorm" and Docusate SOD Caps – Colace.

Plaintiff submitted an OCF disputing the order, stating that he had told York that fiber and Colace make his bowel problems worse, because of prior experience. He accused York of ignoring his statement not to order fiber and Colace and stated, "I'm not going to pay for something that causes me harm. If I wanted to do that, I would have had you give me arsenic." At least with that, I'd be

BM'ing regularly." (Dkt. 21-11, p. 17.) York responded that he believed Fiber-Lax and Colace were the best treatments for his condition. (*Id*.; York Aff., Dkt. 21 ¶ 7.)

October 25, 2010     Plaintiff submitted an OCF addressed to "Roary":

"Everyone has a boss. Who's yours? Who oversees your decisions? Also, whose decision was it to nix the powder fiber products? Yours? CMS heads? I need specific names and titles, of all persons involved in the decision of your boss. Thank you." (Dkt. 21-11, p. 17.)

The response was: "This was discussed at the Idaho Regional Provider Meeting and it was determined that the powdered fiber products are not medically necessary and constipation will be treated with the capsules." (*Id*.)

October 25, 2010     Plaintiff also wrote a second OCF, complaining that Fiber-Lax is a calcium enriched product that does not contain any fiber. NP York wrote back: "Page 279 of the most recent Merck manual states calcium polycarbophil is the only treatment for chronic constipation." (Dkt. 21-11, p. 18.)

Dec. 6, 2010     Plaintiff asked for a double mattress; NP York saw no medical need for the request. (Dkt. 21-2, p. 10.) Plaintiff provided information about his TBI to RN Diane Kaufmann upon her request.

Dec. 16, 2010     Dr. Clayton Bunt saw Plaintiff for his constipation issue. Plaintiff had a soft abdomen, positive bowel sounds, and no masses or abnormally palpable stool. Plaintiff said Fiber-Lax and Colace worked the opposite for him, but that he would try Lactulose (which is the product he did not want from PA Valley at IMSI). Dr. Bunt ordered Lactulose and discontinued the other two products. (York Aff., Dkt. 21 ¶ 9; Bunt Aff., Dkt. 35-9, p. 2.)

Dec. 16, 2010     Plaintiff wrote an OCF to Diane Kaufmann:

"Thank you for getting me in there. You asked about my TBI and I was unable to explain more thoroughly. I didn't receive the proper care from rehab because they too had your thought: 'he seems to function normally enough. Able to walk and think/act on his own.'

Problem is, I created a new type of TBI. They didn't recognize it, and therefore didn't know how to deal with it. Instead of trying, they shunned me. It has taken longer for me to heal, because I had to do it on my own. The only way you'd know I was not normal in function is to be around me on a constant day to day basis. Well, that's basically the rest of it. Thanks for your concern and diligence. Most appreciated." (Dkt. 21-11, p. 22.)

Dec. 22, 2010       Plaintiff had a first dosage of Lactulose. (Dkt. 21-3, p. 21.)

Dec. 24, 2010       Two days later, Plaintiff submitted an OCF stating he did not want to use Lactulose any longer because it caused him bad gas and caused "the ice cream shits"; he needed a bulk-forming laxative. (Dkt. 21-12, p. 1.) The response was that the formulary had Fiber-Lax caps. (Dkt. 21-12, p. 1.) Plaintiff took Lactulose several times after he complained about it and then quit altogether. (Dkt. 23, p. 8.)

Dec. 28, 2010       Plaintiff submitted another OCF stating Fiber-Lax did not work for him. The response was that he was scheduled to see the doctor at his next visit. (Dkt. 21-12, p. 2.)

Dec. 30, 2010       Plaintiff submitted an OCF, stating:

I know you're trying to kill me. That liquid stuff made my guts 10x worse. I haven't shit for 2 ½ weeks, and the pressure is going to my head causing more pressure, and constant nose bleeds. My stomach feels bruised. I've done approx. 4,000 crunches in the past 2 weeks with no [illegible], I work out every day, drink plenty of water. You're just trying to kill me by not giving me what I need. I'm always fatigued and constantly have a feeling to my [illegible] that is indescribable in any one word." This complaint of not having had a bowel movement in two and a half weeks is in contrast to his statement in his December 24, 2010 OCF that he had "the ice cream shits" six days earlier. (Dkt. 21-11, p. 10; compare Dkt. 21-12, p. 1.) NP York discontinued the Lactulose and ordered a consultation with Dr. Phillip Peterson regarding Metamucil versus Fiber-Lax capsules. (York Aff., Dkt. 21, ¶ 9; Dkt. 35-10, p. 4.)[1]

---

[1] Also on December 2010, Plaintiff alleges that the following occurred, but he did not give notice of the incident to Defendants or the medical unit. Plaintiff alleges he suffered bleeding from his rectum. (Complaint, Dkt. 3.) Later, his cellmate, Terry Deveraux, declared: "that on at least one occasion I

| January 6, 2011 | Plaintiff submitted a grievance (No. IO 11000007), stating that Rory York had referred him to Dr. Bunt to address constipation problems, and that Dr. Bunt prescribed Lactulose that made things worse. Plaintiff stated he has not had a bowel movement in 19 days.[2] He sought Metamucil or a product similar to it that is not Fiberlax; he wanted a fiber product, not a calcium-enriched product (Fiberlax contains calcium). (Dkt. 39-4, pp. 1, 5.) |

Defendant Kim Miller, a licensed nursing assistant charged with responding to medical grievances, reviewed the chart and responded. (Kim Miller Aff., Dkt. 35-5, p. 3.) The 1/7/11 response was that he had been seen and/or his file reviewed by a nurse practitioner, a doctor, and the regional medical director, who believed he was given proper treatment for constipation. He was ordered to send in a new HSR if he had increased problems, and he would be scheduled for a re-evaluation. (*Id.*)

Plaintiff complained in the grievance appeal that, even though the treatment given should have worked, it didn't, and, therefore, the medical providers should give him something else, because his problem was worsening. The appeal response was: "The medical assessment of and the treatment plan for you is consistent with medical standards." (*Id.*)

| Jan. 13, 2011 | Plaintiff submitted an HSR because he had a pain from the right side of his gut to his bottom. he said: "it probably has something to do with your lack of competence in giving me a product that works for me so I can poop properly." Defendant Kim Miller responded, noting he was scheduled to be seen, but needed to address staff appropriately or future kites would be returned to him. (York Aff., |

---

witnessed Mr. McDermott fall of the toilet while attempting to defecate, and saw blood dripping down his legs from his back-side." Mr. Deveraux also stated that medical staff responded the next day, and Plaintiff went to the medical unit. Mr. Deveraux stated that, when Plaintiff returned, he was visibly upset over Medical's unwillingness to help him. (Terry Deveraux Affidavit, Dkt. 39-3, pp. 15-16.) The record does not contain any HSR or OCF submitted by Plaintiff that corresponds to these allegations. (Reply, Dkt. 40.) The record does not contain any evidence that Defendants knew of this incident when it occurred.

[2] Plaintiff "admits that his timeline is off, and that his confusion of the time is due to his traumatic brain injury (which area that was affected was the sensory and memory lobes). This admission does not take from the fact that whether 19 days or 6 days, the pain and discomfort was enough that it felt like several weeks." (Dkt. 23, p. 7.)

Dkt. 21, ¶ 10.)

Jan. 14, 2011      Plaintiff refused to be seen when called for exam. (Dkt. 21-8, p. 48.)
                   He alleges he refused to leave his cell because of the severe pain he
                   was in, and medical staff refused to come to his tier to see him. (Dkt.
                   23, p. 8.) The same day he complained that he should not have to cut
                   open his pills and put them into water. Because his form contained
                   vulgar language, Ms. Miller required him to resubmit it in a
                   respectful form. (York Aff., Dkt. 21, p. 5.)

Jan. 30, 2011      Plaintiff wrote an OCF to Nurse Diane Kaufman:

                   "You lied to me. On a kite, you told me I'd be rescheduled to see the
                   same doctor I saw before. then in answer to a possibly life-
                   threatening issue, you ignored me until the next day. I had to deal
                   with the issue in a highly unsanitary way. I refused your
                   incompetence because it wasn't the doctor I was told I'd see. Due to
                   your incompetence, neglect, and indifference to my special
                   circumstance – I still have not been able to have a BM - since the
                   14th. If I die, or something ruptures, my point will be proved. Do
                   your fricking jobs, stop lying to me and yourselves. Prove that
                   you're providing me 'proper care.'" (Dkt. 1-1, p. 13.)

                   Kim Miller responded that the providers were qualified, and that he
                   needed to file a request on the right form, and he would be seen by a
                   medical provider. (*Id.*)

Feb. 3, 2011       Plaintiff submitted an OCF to Kim Miller:

                   "First off, I didn't write you - I wrote Diane Kaufman. If I wanted an
                   answer from you, I would've wrote [sic] to you. Secondly; the
                   reason I was scheduled to be seen by Dr. Bunt and not some other
                   provider is because some other provider (Rory York) - was
                   incompetent in his duties, so [illegible]; NO, just because one is
                   'licensed' in the state of Idaho does not necessarily mean one is
                   'qualified' to practice law [sic]. Incompetence isn't like the common
                   cold, you don't get over it easily; but it is contagious. Don't answer
                   my kites if they're not addressed to you. And stop playing games, get
                   me in to see Dr. Bunt as originally told me." (Dkt. 21-11, p. 14.)

                   Kim Miller responded that she answers all concern forms and

grievances after consulting with the concerned parties, and that the providers were qualified, and that he was being treated for his issues. (*Id.*)

Feb. 11, 2011           Plaintiff was evaluated by Dr. Bunt. Plaintiff reported to Dr. Bunt that he had taken the Lactulose for three to six days, and then stopped because of complaints of gas. He reported that he just had a bowel movement. (Dkt. 35-10, p. 4.) Because Plaintiff continued to complain of constipation, had no masses, and refused laxatives, Dr. Bunt noted the need to establish or verify the constipation aside from Plaintiff's subjective complaints. Dr. Bunt reported that Plaintiff was "fixated on Metamucil." (Dkt. 21-2, p. 9.) Dr. Bunt ordered Miralax (an osmotic laxative) for Plaintiff, on a watch take basis for 90 days. He also ordered that Plaintiff have a plate abdomen x-ray if Plaintiff complained of no bowel movement for more than six days. (Dkt. 35-9, p. 3.) Dr. Bunt had no further involvement in Plaintiff's treatment. (*Id.*)

Feb. 22, 2011           Plaintiff submitted an OCF and said he had not had a bowel movement for 7 days and wanted to be x-rayed. (Dkt. 21-11, p. 15.) Ms. Miller responded that he was scheduled to see a medical provider on that date. (*Id.*) However, Plaintiff refused to see Rory York on that date and refused to sign a refusal of treatment form. (*Id.*) Plaintiff submitted another OCF claiming that York was incompetent and that Plaintiff had been assigned to Dr. Bunt. Ms. Miller wrote back that York was competent and Dr. Bunt was only at the facility occasionally. (*Id.*)

Feb. 24, 2011           Plaintiff wrote an OCF addressed to Rory York:

"I heard you are not a licensed physician - that you are only a licensed veterinarian. Is this true? Do you only possess a license to care for animals? (I prefer that Mr. York answers this himself.)" (Dkt. 21-11, p. 16.)

March 1 or 2, 2011   Plaintiff sent in an OCF, complaining he had not received the Miralax that Dr. Bunt ordered. Kim Miller responded that they had not yet received approval and that Plaintiff was scheduled to see the doctor at his next available appointment. (Miller Aff., Dkt. 35-5, p. 3.)

| | |
|---|---|
| March 7 & 8, 2011 | Plaintiff sent in an OCF stating the he wanted Metamucil, and, if it was given to him, there would be no further problems. Kim Miller discussed the Miralax order with Dr. Petersen on March 8. Dr. Petersen opined that Miralax would not help Plaintiff's symptoms, and instead ordered Fiber-Lax caps. Miller responded, telling Plaintiff that Fiber-Lax was prescribed to him and reminding him to increase his fluid intake and exercise. (Dkt. 35-5, p. 4.) (It is to be noted that Fiber-Lax is the product that Plaintiff had requested on October 14, 2010.) |
| March 10, 2011 | Plaintiff sent in an OCF, stating that he took Fibercon for 3 days, but it did not work. The response was that "three days is insufficient to regulate bowel formation." Plaintiff questioned this response because the Fibercon box, label, contents, and directions states that a bowel movement should occur within 12 to 72 hours, and that the product should not be taken more than 7 days. (Dkt. 39-4, pp. 4-5.) |
| March 10, 2011 | Plaintiff refused to come to pill call. (Dkt. 21-8, p. 43.) |
| March 11, 2011 | Plaintiff refused Fiberlax and Naprosyn. (Dkt. 21-8, p. 42.) |
| March 16, 2011 | Dr. Lossmann wrote to Linda Gerhke, suggesting that Plaintiff be given Metamucil on a watch-take basis. (Dkt. 39-4, p. 7.) NP York made this notation in Plaintiff's medical records, but mistakenly wrote 3/16/10 rather than 3/16/11. (Dkt. 21-1, p. 5.) |
| March 17, 2011 | Plaintiff wrote an OCF stating: |
| | Despite your opinion, I do have medical cause for a PET scan. I can feel my symptoms getting worse: vertigo, visual blurring/fading; hand pains getting worse; fatigue; weakness; drowsiness for no reason; feelings of "otherness" and other visual/physiological symptoms pertaining to a TBI. I believe the "gaping hole/space"in my brain has gotten larger. To verify this I need at least an x-ray of my head to determine what has happened." (Dkt. 21-11, p. 9.) |
| Mar. 17, 2011 | NP York started Plaintiff on Metamucil one time daily on a watch take basis. ( Dkt. 39-4, p. 12.) In Plaintiff's original claim, he stated he only received the Metamucil for three days before it was discontinued, and he was "returned to a calcium-based product... called 'Natural Vegetable Fiber' - a generic brand of the most |

generic brand of Metamucil." (Complaint, Dkt. 3, p. 8.) Later Plaintiff stated that this was "[a] slight miscalculation on his part – it was actually 7 days. The record reflects that he took "Psyllium SF Powder - Metamucil" (regardless of whether it was brand-name or generic) once a day from March 17, 2011 through April 13, 2011, nearly a month. (Dkt. 21-3, pp. 9-10.)[3]

Mar 19 - 31, 2011    Plaintiff's Medication Administration Record shows one dosage of "Metumucil" was given to him each evening. (Dkt. 39-4, p. 3.)

March 28, 2011    Plaintiff requested by OCF that he be given "Metamucil" twice daily, rather than once daily, as he was previously ordered. (Dkt. 39-4, p. 10.) Kim Miller of CMS responded that he needed to send his request to the medical unit on an HSR form.

April 1 -13, 2011    Plaintiff continued to receive one dosage of "Metamucil" in the morning. (Dkt. 39-4, p. 12.)

April 13, 2011    Plaintiff submitted an HSR requesting that he be given Metamucil twice daily because "I've been on it now for more than 7 days." (Dkt. 39-4, p. 13.) Plaintiff states that he had "great results from taking "Metumucil" for 7 days. (Dkt. 23, p. 11.)

April 14 to Apr 30    Plaintiff was given one tablespoon of "Metamucil" in the morning and evening on a "watch take" basis. This was prescribed for 90 days, from April 14 to July 14, 2011. (Dkt. 39-4, p. 12.)

May 14, 2011    Plaintiff began refusing "Metamucil" because he stated in writing that he was experimenting with how his medications were interacting with each other. He asked that his "Metamucil" not be discontinued. (Dkt. 21-8, p. 36, 37.)

May 19, 2011    Plaintiff refused "Metamucil."

May 21, 2011    Plaintiff refused "Metamucil" and Neurontin in advance by writing a note, because he wanted to sleep due to a lack of sleep the night before.

---

[3] Defendants do not refute Plaintiff's allegation that name-brand Metamucil was switched to generic psyllium at some point in time during the course of Plaintiff's prescription for Metamucil, and the Court does not find this point material, for reasons discussed below.

| | |
|---|---|
| May 23, 2011 | Plaintiff refused "Metamucil," Neurontin and Prilosec. (Dkt. 21-8, p. 32.) NP York then changed the Metamucil to an as needed basis for the remainder of the 90 days. |
| June 1 -13, 2011 | Plaintiff continued to refuse "Metamucil," Neurontin, and Prilosec (Dkt. 21-3, p. 4.) |
| June 11, 2011 | Dr. Petersen determined that Plaintiff's belief that generic psyllium had added calcium that caused constipation was a theoretical issue without any data suggesting that there was any clinical difference between brand-name and generic Metamucil. The request for the brand name Metamucil was denied. Dr. Petersen stated, "If the patient has clinical data, he may submit that to me for review." (York Aff., Dkt. 21, p. 8; Dkt. 21-2, p. 3.) |
| June 24, 2011 | Plaintiff asked Nurse Practitioner Katrina Bentley of ICI-O to order brand-name Metamucil for Plaintiff on a PRN basis, and she did so. (Complaint, Dkt. 3, p. 9; Dkt. 21-2, p. 31.) |
| July 2011 | Plaintiff submitted an HSR: "Mr. Lossmann had 'suggested' giving me the brand name Metamucil. This treatment has been altered and prevented by [illegible] who doesn't know my history (Dr. Petersen). I'm requesting to be placed on 1 of 3 products: (1) Metamucil; (2) Revita; or (3) Konsyl. All are products of Metamucil and do not contain additives that harm me." This request was denied by Dr. Petersen, with Ms. Miller conveying the response to Plaintiff. (Dkt. 39-4, p. 14.) |
| July 13, 2011 | Plaintiff filed an OCF: "I have marked constipation due to calcium build-up. My request wasn't just because of the labeling. I didn't even look at the label until I was taking the product for 14 days without a BM. You need to show due diligence and [read] my fricking file. CMS just got fined $100,0000 for not giving proper mental health care....Read my ENTIRE file - current to back - logged. If you need more proof, I'll give you the phone number to my attorney - who has been helping me fight you A-holes over this matter for 7 years. How much more proof do I need?" (Dkt. 21-11, p. 2.) |
| July 22, 2011 | Plaintiff filed this lawsuit. |

| | |
|---|---|
| Aug 3, 2011 | Dr. Petersen evaluated Plaintiff for constipation. Plaintiff said he had chronic constipation from calcium build up. Plaintiff said that Lactulose caused him severe pain in the gut and the inability to have a bowel movement for 19 days. He said his constipation persists regardless of how much exercise he gets or water he drinks. He requested an MRI to look at his whole body because he had a head injury and thought that he may have problems in the bowel from his head injury. Plaintiff had a soft abdomen with normal bowel sounds and no tenderness, and appeared healthy. Dr. Petersen's assessment was a professed pardoxical reaction to all products except Metamucil, and it made no sense that only Metamucil would be effective and that Lactulose would be constipating. Dr. Petersen ordered an abdominal x-ray and a stool sample. The stool specimen was normal, except there was a moderate white blood cell count. the radiology report showed normal colonic fecal content and distribution. (Dkt. 39-4, p. 16; Dkt. 21-1, p. 6; Dkt. 21-2, pp. 1-2.) |
| October 27, 2011 | Dr. Petersen reviewed Plaintiff's abdominal films, which were taken when Plaintiff was complaining of severe constipation. The films did not show any significant impaction or bowel dilation. There was no clearly marked megacolon or any evidence of significant gas or fecal pattern abnormalities. (Dkt. 21-1, p. 29.) |
| December 15, 2011 | Plaintiff had a colonscopy. He was diagnosed with "Mild diffuse colitis, unknown etiology, differential to include microscopic colitis, viral, irritable bowel syndrome with primary constipation. The procedure was for the purpose of ruling out inflammatory bowel disease. The plan in the report was to await the biopsy results and to "continue routine protocol diet per ICIO medical." (Dkt. 39-4, pp. 16-17.) PA Rory York reviewed the report on the same day and noted, "Continue current treatment plans[;] await biopsy results." (Dkt. 39-4, p. 19.) |
| December 19, 2011 | Biopsy results: "The colonic biopsies (specimens B-E) demonstrate mildly increased inflammation. There is a suggestion of decreased number of crypts in the distal transverse and rectal biopsies (specimens B and E) which could indicate chronicity. Active colitis is not present and no granulomas or ulceration are seen. These changes are non-specific. Clinical correlation is recommended. (Dkt. 39-4, p. 20.) |

December 21, 2011    The pathology report was issued, showing: "? microscopic colitis, may benefit from low dose flagyl," with a note to "forward to ICIO medical and Dr. Petersen." (Dkt. 39-5, p. 18.)

December 23, 2011    Dr. Petersen examined Plaintiff, who had lost weight but was in no distress. Dr. Petersen reviewed the colonscopy results, which were normal but showed "low grade chronic inflammation, but not diagnostically precise." Petersen indicated he would consult with the gastro-intestinal provider, but not make any changes to treatment in the interim. (York Aff, Dkt. 21, p. 9; Dkt. 21-1, p. 27.) Plaintiff said that he may refuse to go to the specialist if it involves much time in Boise. (Dkt. 21-1, p. 27.)

December 24, 2011    Plaintiff sends in an OCF asking why the GI specialist could not come to the prison instead of Plaintiff going to the specialist's office, because it "really is a large inconvenience for me because I'd have to sit in 8 House with no property for however long I'd have to be down there." Plaintiff also demanded that Dr. Petersen answer the OCF, rather than Kim Miller. Ms. Miller wrote back: "I answer all concern forms after consulting with the provider. You are not scheduled for an offsite - if you are having problems, please put your request on a medical kite and I will schedule you with the provider at his next available appt. " (Dkt. 21-10, p. 12.)

January 17, 2012    Dr. Petersen evaluated Plaintiff, who was not taking anything for his bowel. Dr. Petersen wrote: "I have discussed this case with GI. The findings on the biopsies and colonoscopy were non-specific and didn't indicate colitis. Rather, I was given the advice that we needed to get control of his constipation. The specialist I talked to was not concerned based of [sic] the biopsy and colonoscopy about any serious colonic disorder." Dr. Petersen's assessment was constipation and that Plaintiff was noncompliant with his recommended treatment and that his focus was on being different from anyone else. (*Id.*; Dkt. 21-10, p. 26). Dr. Petersen told Plaintiff that his issues were irritating but not dangerous, and that "we have the tools in our formulary to take care of [your] problem." (*Id.*)

April 12, 2012    Plaintiff was evaluated by Dr. Petersen. He again appeared normal. Dr. Petersen found that the complaints of constipation were not supported with any objective evidence or real problems. (Dkt. 21-1, p. 23.)

**MEMORANDUM DECISION AND ORDER - 20**

| | |
|---|---|
| May 2, 2012 | Plaintiff submitted an HSR requesting fiber powder. Dr. Petersen required Plaintiff to state in writing that he wanted it and agreed to take it. Plaintiff refused. He later filed a grievance (No. IO 12000000262), that was upheld due to his previous noncompliance with taking medication. (Dkt. 21-12, pp. 3-4.) |
| July 13, 2012 | Dr. Peterson evaluated Plaintiff, who appeared normal. Plaintiff reported intermittent constipation, with weeks of regularity in between, and that he had a bowel movement three days earlier. Dr. Petersen noted that Plaintiff was able to participate in the stool studies, colonoscopy, and abdominal films done (all showing the presence of normal stool), despite Plaintiff's complaints that he had no bowel movements. Dr. Petersen noted that Plaintiff has not been willing to take the formulary medications nor the nonformulary medication prescribed. Dr. Petersen told Plaintiff he would be better taking the prescribed medications, and he would restart a psyllium (natural vegetable fiber) order if Plaintiff were willing to take it.[4] (Dkt. 21-9, pp. 20-21.) |
| July 14, 2012 | Plaintiff refused to take the natural vegetable fiber at a.m. pill call, but wanted to take it in the evening instead. (Dkt. 21-9, p. 37.) |
| July 15-23, 2012 | Plaintiff refused to take the natural vegetable fiber. (2nd York Aff., Dkt. 35-7, p. 2; Dkt. 35-8, pp. 3-5.) He said the a.m. dosage was not convenient, and would not interrupt his phone call when pill call sent an officer to get him. (Dkt. 21-9, pp. 19, 32-35.) |
| Aug. 1 - 12, 2012 | Plaintiff took the natural vegetable fiber. (*Id.*) |
| Sept. 17, 2012 | Plaintiff sent in an HSR asking about "Flagyl," an antibiotic suggested by Dr. Meza after he had received the colonoscopy. Plaintiff had learned about the Flagyl recommendation by reviewing medical records received in the discovery of this case. Plaintiff asked Rory York about it and York knew nothing about it. and said he had never seen the report before. York provided Plaintiff with a 10-day Flagyl prescription, and Plaintiff found that it gave him some relief. |

---

[4] This prescription was in contrast to the earlier prescription for brand name Metamucil, which showed "psyllium - Metamucil." This new one was for "natural vegetable fiber." (Dkt. 21-9, p. 22.) It is unclear from the record whether this prescription was for psyllium or another type of vegetable fiber.

(Dkt. 39-5, p. 13-18.)

| February 5, 2013 | Plaintiff complained of urination and BM problems, with burning urination as the primary problem. (Dkt. 35-8, p. 10; 2nd York Aff., Dkt. 35-7, p. 2.) |

In addition to Plaintiff's complaints about constipation, the record is replete with complaints about other health issues, such as dental care, trouble breathing, and a myriad of problems, some of which Plaintiff attributes to his traumatic brain injury.

**3.    Discussion**

**A.    *Plaintiff's Objections to Defendants' Failure to Explain a Widened Scope of Treatment Beyond the Pleadings***

The Court first addresses Plaintiff's objections alleging that Defendants have ignored some of the time periods for which they provided him treatment or performed administrative work on his medical file. However, Plaintiff's Complaint asserts claims against Defendants during a discrete time period. Defendants' Motion for Summary Judgment, with supporting Affidavits and exhibits, addresses that discrete time period. Therefore, Plaintiff's responsive allegations that Defendants are deliberately ignoring or attempting to "hide" other care provided to Plaintiff outside the time period alleged in the Complaint are unfounded.

No supplemental pleadings have been proposed to extend the scope of the claims to additional time periods. However, in pro se prisoner Eighth Amendment medical care cases, the Court generally considers the entire length of time for which medical records are submitted if the plaintiff has asserted a claim for injunctive relief, as in this case. Even

considering the additional allegations and medical records for the expanded time periods covered by Plaintiff in his Response, the Court concludes that Plaintiff has failed to bring forward sufficient evidence from which a jury could find that Defendants were deliberately indifferent to a serious medical condition of Plaintiff, as it will now explain.

### B. *Plaintiff's Treatment at IMSI Facility*

#### (1) PA Valley

As the chronology above shows, Physician's Assistant Matthew Valley examined Plaintiff at IMSI in 2010. Plaintiff has provided no medical records showing when he first began to complain of constipation, but the medical records provided to the Court reflect that Valley prescribed Bentyl, a formulary drug, for his constipation condition in or about March 2010. When Plaintiff complained about the side effects of this medication, it was discontinued.

The record reflects that, on August 23, 2010, Valley tried to prescribe a different type of medication that Plaintiff had not tried, Lactulose (an osmotic laxative). Plaintiff was worried about developing a dependence upon a laxative, but there is no indication in the record that Valley's plan was to have Plaintiff take Lactulose on a permanent basis.

Between March and September 2010, Plaintiff requested to be placed on brand-name Metamucil, even though it was not a regular formulary medication. PA Valley did not place him on Metamucil, but offered Lactulose, another formulary medication. In the first round of his grievance proceedings, Plaintiff argued about the propriety of prescribing Lactulose but stated that he agreed to try it; however, in the second round of

the grievance proceedings (the appeal), Plaintiff learned that brand-name Metamucil *could* be ordered into the pharmacy for him even though it was non-formulary *if* he had tried all formulary prescriptions. At that point on, he insisted on brand-name Metamucil. Plaintiff was transferred to a different facility in October 2010, and PA Valley's treatment of Plaintiff ended.

On this record, the Court concludes that Plaintiff has not produced sufficient evidence to show that PA Valley was deliberately indifferent to a serious medical need of Plaintiff between March and October 2010. Plaintiff has not provided earlier medical records documenting any long-standing serious condition. The record reflects that Valley began a conservative course of treatment for Plaintiff's complaints of constipation with the various medications that were available in the formulary, but Plaintiff would not cooperate with that plan. There is no hint in the record that PA Valley (1) knew of or drew an inference of a substantial risk of harm to Plaintiff's health with the course of treatment chosen for Plaintiff, and (2) recklessly disregarded the risk and continued the course of treatment anyway. For that matter, Plaintiff has not come forward with sufficient medical evidence from which a jury could find that a substantial risk of harm to his health existed during the time period PA Valley treated Plaintiff, as a result of Plaintiff's undocumented complaints of constipation.

Whether PA Valley's choice of medications was optimal or the one Plaintiff requested is not at issue in the inquiry into the subjective prong of the deliberate indifference analysis. The Eighth Amendment does not provide a right to a specific

treatment. *See Forbes v. Edgar*, 112 F.3d at 267. Plaintiff has failed to come forward with sufficient evidence to show that PA Valley's recommendation to try several constipation medications offered by the prison formulary was "so inadequate that it demonstrated an absence of professional judgment, that is, that no minimally competent professional would have so responded under those circumstances." *Collignon v. Milwaukee County*, 163 F.3d at 989. Plaintiff has not supported his position with an opinion from any medical provider showing that, under the circumstances reflected in the record, PA Valley's course of treatment at IMSI was even negligent (which does not rise to the level of an Eighth Amendment violation).

As a result of the foregoing, PA Valley is entitled to summary judgment, and Plaintiff's claims against PA Valley will be dismissed with prejudice.

(2)     Bruce Cooper

Bruce Cooper was an unlicensed correctional medical specialist (CMS) who worked at IMSI during the time period PA Valley treated Plaintiff. CMS Cooper does not recollect treating Plaintiff. However, Plaintiff asserts that Cooper denied him a prescription for Metamucil in August or September of 2010. (Complaint, Dkt. 3, p. 3.) As shown above, the evidence presented by Plaintiff shows that, during this time period, Plaintiff was being assessed and treated by PA Valley and that PA Valley was responding to Plaintiff's written complaints about treatment. Nothing in the record shows it would have been appropriate for CMS Cooper to override PA Valley's treatment plan. Whereas PA Valley was licensed and authorized to prescribe medications, CMS Cooper was not

licensed or authorized to prescribe medication or issue orders for products such as Metamucil. (Bruce Cooper Affidavit, Dkt. 35-11.)

In response to Defendants' Motion, Plaintiff argues that he did *not* allege that CMS Cooper failed to prescribe him proper medication, but, rather, alleged that CMS Cooper "delayed" Plaintiff's treatment "due to Mr. Cooper's belittling and rude attitude toward the Plaintiff." (Dkt. 39-1. p. 3.) Plaintiff theorizes that he was justified in refusing to interact with or accept medical care from CMS Cooper because Cooper was rude. (Dkt. 39-1, p. 3.) Plaintiff supports his argument by several OCF forms (some of which contain Plaintiff's own derogatory and abusive remarks about CMS Cooper), a grievance, and a letter he wrote complaining that CMS Cooper had a "snarky attitude" and treated inmates badly. Notably, all of Plaintiff's complaints arise from a prior time period of March and April 2010, not August or September 2010. The responses to Plaintiff's complaints informed him that he could not pick and choose his medical providers, that Cooper was assigned to triage all patients' needs, and that another medical staff person would attend the next sick call with CMS Cooper to "see what the problem is." (Dkt. 39-5, pp. 29-33.)

While CMS Cooper's delivery of medical service in an allegedly rude manner may not be the most pleasant or effective way to treat patients, it does not amount to deliberate indifference. *Oltarzewski v. Ruggiero*, 830 F.2d 136 (9th Cir. 1987) (without other allegations, verbal abuse alone does not amount to a constitutional violation). Nor has Plaintiff shown a causal link between CMS Cooper's allegedly bad attitude in March and April 2010 (or at any time after that) and any failure to provide a constitutionally-

adequate course of treatment to Plaintiff in August and September 2010. Rather, it is Plaintiff's own refusal to work with CMS Cooper that would have caused any delays in Plaintiff's medical treatment. On this record, Plaintiff has not provided sufficient evidence from which a jury could find that CMS Cooper knew of or drew an inference of a substantial risk of harm to Plaintiff's health, and yet recklessly disregarded that risk. In addition, as above, Plaintiff also has not provided evidence showing a substantial risk of harm was present during the time period in which Plaintiff alleges CMS Cooper delayed his treatment. Therefore, CMS Cooper is entitled to summary judgment.

### C. *Plaintiff's Treatment at ICI-O*

#### (1) Treatment from October 2010 to February 2011

Plaintiff was transferred to a different prison facility, ICI-O, in October 2010. Plaintiff saw Nurse Practitioner Rory York for the first time in October 2010 for constipation complaints. Plaintiff asserts that he told York during the visit that "fiber and Colace" did not help his constipation. York researched the issue and determined that a calcium polycarbophil product was the best way to treat chronic constipation. He then prescribed Fibernorm or Fiber-Lax and Colace. When Plaintiff complained that he disagreed with the treatment and had told York that these products did not work for him previously, York responded that he believed it was the only treatment for chronic constipation, and that the medical providers at the Idaho Regional Provider Meeting determined that powdered fiber products were not medically necessary and that constipation could be treated with the fiber capsules.

Plaintiff did not try the fiber capsules and Colace for a sufficient period (or at all) to find out if they would work. Neither does Plaintiff point to any place in the medical records showing that Plaintiff previously tried these products for a sufficient time period to determine their efficacy. Plaintiff admits that his TBI caused him to confuse time lines, and there is nothing in the record supporting Plaintiff's bald statement that fiber and Colace had not helped him in the past. As a result, Plaintiff has not brought forward sufficient evidence from which a jury could find that York determined that fiber capsules and Colace posed a substantial risk of serious harm to Plaintiff and yet prescribed them anyway. Rather, the record reflects that York relied on the Merck manual to make a determination of what to prescribe for Plaintiff's reported symptoms of constipation.

Next, Plaintiff asked for a double mattress memorandum from York. However, York found no medical need for the request. Plaintiff has not brought forward sufficient evidence showing that he had a medical need for a double mattress, and that York exhibited deliberate indifference by not approving one.

Plaintiff next saw Dr. Clayton Bunt, who found *no evidence* from the bodily examination of Plaintiff that he was suffering from extreme constipation. On the first visit, Dr. Bunt felt no palpable stool in Plaintiff's abdomen that would support the complaint of constipation, and on the second visit Dr. Bunt noted that Plaintiff reported he had just had a bowel movement. These objective facts did not support the claims of severe, painful, ongoing constipation.

Plaintiff told Dr. Bunt that Fiber-Lax and Colace worked the opposite for him, and

that he would try Lactulose, which is the product he refused from PA Valley at IMSI. Plaintiff took Lactulose for the first time on December 22, 2010, and, two days later, Plaintiff complained that it gave him the "ice cream shits," and said he was going to refuse to take it after that. Plaintiff took Lactulose several more times after he stated in writing he would not take it. Plaintiff demanded a bulk-forming laxative, and he was told that he could have Fiber-Lax, the bulk-forming laxative available in the formulary. He responded that it did not work for him. On December 30, he submitted an OCF stating that he had not had a bowel movement in two weeks, which is contrary to his statement six days earlier that he had taken Lactulose and it made his stool too soft.

Dr. Bunt decided to place Plaintiff on a laxative on a "watch take" basis for 90 days, so that he could obtain an objective study of Plaintiff's complaints. He found a need to establish or verify the complaint of constipation, given that Plaintiff had no masses and continued to refuse laxatives. Dr. Bunt also ordered that Plaintiff be x-rayed if he went without a bowel movement for six days. (Bunt Aff., Dkt. 35-9, p. 2.)

Plaintiff, in fact, submitted an OCF asking for an x-ray because he had not had a bowel movement in six days, and Plaintiff was scheduled to see NP York that same day. However, rather than agree to see NP York so that he could obtain the x-ray that Dr. Bunt ordered, Plaintiff refused to see NP York but felt he should be taken immediately to the x-ray unit. In this manner, Plaintiff obstructed his opportunity to obtain an x-ray as ordered by Dr. Bunt. Plaintiff's argument that he "refused to see York because it was an unnecessary step meant to delay the ordered x-ray" (Dkt. 23, p. 9) is merely his own

opinion and does not excuse his refusal to cooperate with the medical unit in obtaining an x-ray through NP York. As a result, at that point in time, there was no objective evidence showing that Plaintiff had an serious, ongoing constipation problem.

Plaintiff also alleges that Dr. Bunt should not have prescribed him a laxative for a prolonged period of time because over-the-counter laxatives bear a label that they should not be taken for more than a few days without consulting a doctor. This argument is not enough to show that Dr. Bunt was deliberately indifferent, because Dr. Bunt *is* a doctor consulting with Plaintiff who has the expertise to authorize a longer treatment, and Dr. Bunt had ordered the laxative for a particular purpose. Nothing in the record shows that Dr. Bunt treated Plaintiff in a reckless or deliberately indifferent manner during the limited time period he treated Plaintiff.

Based on the foregoing, Plaintiff has not brought forward facts from which a jury could find that Plaintiff has met the objective or subjective prong of the deliberate indifference test as to NP York or Dr. Bunt, based on treatment at ICI-O from October 2010 to February 2011. Consequently, they are entitled to summary judgment.

(2)    Treatment from February 2010 to June 2011

Dr. Petersen was the medical director of the ICI-O medical clinic during the time period in question. He also provided medical care to inmates at ICI-O. (Dr. Petersen Aff., Dkt. 35-13, p. 2.) Dr. Petersen declares by Affidavit that the common causes of constipation include "inadequate water intake, inadequate fiber in the diet, a disruption of regular diet or routine, inadequate activity or exercise, resisting the urge to have a bowel

movement, overuse of laxatives, and certain pain medications." (Dr. Petersen Aff., Dkt. 35-13, p. 3.) Dr. Petersen states that the main treatment for constipation involves the increased intake of water and fiber. (*Id.*)

After Plaintiff refused to take Lactulose, Dr. Bunt ordered Miralax for Plaintiff on February 11, 2011. Plaintiff thereafter sent in several complaints about NP York and refused to see York on February 22. On March 1, Plaintiff complained that he never received the Miralax, and he was told by Defendant Kim Miller that it had not been approved. Plaintiff then wrote to Miller seeking Metamucil.

Ms. Miller discussed Plaintiff's OCF complaints with Dr. Petersen on March 8. At that time, Dr. Petersen did not approve the Miralax, but instead ordered fiber capsules from the formulary for Plaintiff. After three days, Plaintiff sent in an OCF complaint that the fiber capsules did not work. Dr. Petersen responded that three days was insufficient to determine whether the fiber capsules would work.

Plaintiff alleges that Dr. Petersen was deliberately indifferent for ordering fiber capsules without reviewing Plaintiff's medical records to see that Plaintiff had previously stated that fiber capsules did not work for him. However, at the same time Plaintiff was refusing fiber capsules, he was seeking Metamucil, another form of fiber, through his OCF complaints. Dr. Petersen responded to Plaintiff's request for a fiber supplement by offering a fiber supplement. As noted above, no objective proof of Plaintiff's complaints of severe, ongoing constipation were documented in the medical records. Neither was there documentation showing that Plaintiff previously tried fiber capsules for a sufficient

length of time to allow medical providers to determine whether they worked. Nor has Plaintiff provided a medical opinion supporting his contention that no type of fiber supplement works for him except brand-name Metamucil. Because this was Dr. Petersen's first intervention into Plaintiff's treatment, and there is no evidence in the record reflecting that any medical records previously documented that fiber capsules would not work for Plaintiff, the Court concludes that Plaintiff has brought forward insufficient evidence from which a jury could find that Dr. Petersen determined that fiber capsules posed a substantial risk of serious harm to Plaintiff and yet prescribed them anyway.

Plaintiff took the fiber capsules for three days, and then complained that they did not work. Dr. Petersen responded that Plaintiff needed to take the fiber capsules for more than three days. As with Dr. Bunt, Plaintiff argued with Dr. Petersen that the box instructions were contrary to Dr. Petersen's advice. Plaintiff refused the fiber capsules.

At that point, Dr. Lossmann suggested that Plaintiff be given brand-name Metamucil, Plaintiff's fiber of choice, on a watch-take basis. NP York began Plaintiff on one dosage of Metamucil the next day, March 17, 2011. Plaintiff took one dosage of Metamucil from March 17, 2011, through March 28, 2011, a period of eleven days, after which time he requested by OCF to be given two dosages per day because the Metamucil was working. However, because he did not use an HSR form as he should have, he continued to receive the single dosage of Metamucil until April 13, an additional period of ten days, before he submitted an HSR and was placed on two dosages per day.

Plaintiff alleges that the Metamucil worked great for seven days, but, when he asked for it to be increased to twice daily, medical providers began giving him generic psyllium instead. Elsewhere, he alleges that the time period was not seven days, but only three days, before the brand-name was switched to the generic product. Finally, in his Response to the Motion for Summary Judgment, he states that the time period that he was given brand-name Metamucil was approximately 2 or 3 weeks (it appears Plaintiff wrote 3 first, and then overstruck it with 2). (Dkt. 39-2, p. 8.)

Regardless, Plaintiff made no major complaints of constipation during the entire time he asserts that the generic psyllium was substituted for brand-name Metamucil. Plaintiff was on one dosage of either Metamucil or generic psyllium from March 17, 2011, through April 13, 2011, a period of twenty-one days, with a report that the product was "working great," and no complaints that the product was not working. On April 14, pursuant to his own request, he began accepting two dosages of the product. Plaintiff's acceptance of two dosages of what he alleges was generic psyllium continued for a period of approximately thirty days without complaint. On May 14, 2011, Plaintiff wrote to the medical unit that he was beginning an experiment with all of his drugs to determine how his medications were interacting with one another, but he made no complaints of constipation. Importantly, on May 14, 1011, he asked that his "Metamucil" prescription not be discontinued, notwithstanding the fact that he believes the prescription had been changed to generic psyllium on March 20, March 28, or April 14.

Therefore, during the majority of the time period from March 17, 2011 through

May, 14, 2011, when Plaintiff received what he alleges is generic psyllium, Plaintiff had no documented bowel movement complaints during that time period. When Plaintiff began refusing Metamucil, along with all of his other medications, NP York changed the Metamucil to an as needed basis.

Dr. Petersen denied Plaintiff's request for brand-name Metamucil on June 11, 2011. (Dkt. 21-2, p. 3.) Before denying the request, Dr. Petersen researched Plaintiff's complaint that he believed generic psyllium had added calcium, which caused constipation. Dr. Petersen was unable to find any outcome data suggesting that constipation would result from generic psyllium or that there was any clinical difference between the generic psyllium and brand-name Metamucil. Dr. Petersen told Plaintiff that, if he submitted clinical data supporting his contentions about generic psyllium, Dr. Petersen would review it. Plaintiff did not provide Dr. Petersen with any contradictory data, nor does he do so here in response to the Motion for Summary Judgment.

Because Plaintiff has not come forward with either sufficient objective or subjective evidence from which a jury could find deliberate indifference to a serious medical need of Plaintiff, Defendants NP York, Dr. Bunt, and Dr. Petersen are entitled to summary judgment for treatment rendered during this time period.

(3)    <u>Treatment from August 2011 to July 2012</u>

On August 3, 2011, upon Plaintiff's further complaints that he had been constipated for nineteen days (which Plaintiff now admits was likely only six days), Dr. Petersen examined Plaintiff and found that Plaintiff had a soft abdomen, normal bowel

sounds, no tenderness, and that he appeared healthy. Because Plaintiff's reports that the fiber products did not work did not make sense, Dr. Petersen ordered an abdominal x-ray and a stool sample. On October 27, 2011, Dr. Petersen reviewed the x-ray report, which showed normal colonic fecal content and distribution. The stool sample showed a moderate white blood cell count. Because Dr. Petersen wanted to check out the white blood cell count factor, he ordered a colonscopy.

On December 15, 2011, Plaintiff underwent the colonscopy. The colonscopy, biopsy, and pathology reports were normal, with the biopsy report showing no active colitis," and the pathology report showing: "? microscopic colitis, may benefit from low dosage flagyl." Dr. Petersen reviewed the colonscopy results with Plaintiff, which Dr. Petersen characterized as normal with "low grade chronic inflammation, but not diagnostically precise." Dr. Petersen then told Plaintiff he did not want to change the treatment plan until he had spoken to the gastro-intestinal provider. Plaintiff said that he might refuse to go to the specialist if it involved much time in Boise.

When Dr. Petersen spoke to the specialist, Dr. Petersen was given the advice to get control of Plaintiff's complaints of constipation. The specialist also said that he was not concerned about any serious colonic disorder. Dr. Petersen saw Plaintiff on January 17, 2012, and relayed this information. Dr. Petersen told Plaintiff his bowel issues were irritating but not dangerous, and that "we have the tools in our formulary to take care of [your] problem." Plaintiff sent in various OCFs asking for a comparison of the labels of the products and questioning the medical providers' requirement that Plaintiff agree to

take the product in writing in January and February 2012, but the medical unit held firm.

Plaintiff saw Dr. Petersen again on April 12, 2012, at which time Plaintiff indicated that he was worried about his infrequent bowel movements, but Dr. Petersen noted that Plaintiff will still unwilling to take the fiber products offered.

On May 2, 2012, Plaintiff requested fiber powder. Dr. Petersen required Plaintiff to state in writing that he wanted fiber powder and would take it, and then Dr. Petersen would order the powder for him. Plaintiff refused to make such a request between May 2, 2012, and July 13, 2012. Plaintiff complained again about constipation on July 13, 2012, and Dr. Petersen ordered "natural vegetable fiber" for Plaintiff.

On September 17, 2012, after Plaintiff reviewed his medical records received in discovery in this lawsuit, he noticed that Dr. Meza thought Plaintiff might benefit from a prescription of Flagyl. When Plaintiff asked NP York about the Flagyl, Plaintiff reports that York knew nothing about it. York then reviewed Dr. Meza's records, and prescribed Flagyl to Plaintiff for ten days. Plaintiff reported that the medication gave him some relief.

Plaintiff makes a variety of arguments that Dr. Petersen and NP York were deliberately indifferent to his serious medical needs during this time period. However, the record reflects otherwise. First, Plaintiff has provided insufficient evidence that any delay between the time period when Dr. Petersen waited to read the abdominal radiology report and the colonscopy was scheduled caused Plaintiff serious harm, or that Dr. Petersen knew or drew an inference that it would place Plaintiff in a substantial risk of serious

harm if Plaintiff did not receive a colonscopy immediately.

As to Plaintiff's argument that Flagyl should have been provided to him, but was not until he asked about it nine months after Dr. Meza suggested it, the record does not contain sufficient evidence to show that the medication was necessary or that the providers disregarded this recommendation out of recklessness or indifference. The record of Dr. Meza is inconclusive. It questions whether Plaintiff has microscopic colitis, and it states that Plaintiff "might" benefit from Flaygl. Therefore, Plaintiff has failed to show that he had an objectively serious condition.

Dr. Petersen's medical records indicate that he spoke to the gastro-intestinal specialist about the results of the tests and that Dr. Petersen believed the report from Dr. Meza as to whether Plaintiff had a low grade chronic inflammation was "not diagnostically precise." The specialist recommended that Dr. Petersen resolve the constipation issue, ahead of anything else, and the specialist was not concerned about the results of the colonscopy. Therefore, while Plaintiff takes issue with the fact that Dr. Petersen did not implement the recommendation of Dr. Meza for the Flagyl, it is clear that Dr. Petersen was following a plan to address the constipation first, rather than a questionable low-grade inflammation, and that Dr. Petersen did not believe that Plaintiff had a serious condition, in reliance upon the specialist's opinion and the colonscopy report results. Dr. Petersen also told Plaintiff that his condition was irritating but not dangerous, which is further evidence that Dr. Petersen did not act out of recklessness or deliberate indifference when he did not order Flagyl for Plaintiff, but continued on the

plan to convince Plaintiff to try generic psyllium for his constipation.

As to NP York's failure to prescribe Flagyl sooner than he did, Plaintiff himself has brought forward evidence showing that NP York was unaware of the Flagyl recommendation until Plaintiff pointed it out from reviewing the medical records in discovery, and then York immediately prescribed it when Plaintiff sought it. Though the failure to consider this medication sooner might edge into the realm of negligence, neither this nor anything else in the record shows that York earlier saw the recommendation, determined that it would be a helpful prescription, and yet chose to disregard it.

To show he had a serious medical need that was disregarded by his medical providers, Plaintiff has drawn a large number of conclusions and causal links from the information in the reports from Plaintiff's visit to Dr. Meza. However, it is clear from the record that Plaintiff does not have the medical expertise to draw such conclusions. For example, Plaintiff argues: "When the colonscopy procedure began, the doctor performing it – Dr. Michael Meza, M.D. – found a tissue blockage which caused tearing and bleeding." (Dkt. 39-4, p. 22.) Similarly, Plaintiff speculates: "The neglect of care by the defendants quite possibly caused the microscopic colitis and colon tearing. – Colitis is progressive, – it has to first be microscopic before it turns full blown."(*Id.*)

Without any medical support, Plaintiff's interpretation of the technical reports of Dr. Meza is mere speculation. Similarly, Plaintiff has not come forward with sufficient evidence to show that he had a serious medical condition that was ignored by Defendants. Plaintiff's verbal reports of long-term constipation are not supported by the evidence in

the record, including the fact that the stool within his colon seemed normal each time he was tested – during stool samples, the colonscopy, the abdominal x-ray, and various physical examinations to check for a build-up of stool in the intestines or colon. Neither is there objective evidence in the record that Plaintiff has a calcium intolerance, that he took any fiber product containing calcium for any length of time during the course of his treatment such that a calcium build-up could have occurred, or that he actually suffered from a calcium build-up.

In the course of this litigation, Plaintiff has admitted that his TBI causes difficulty and confusion with time lines. The record reflects that Plaintiff has conveyed a confusing and inaccurate oral history of how long he has been constipated (admitting that 19 days was likely only 6 days), or on which dates he had a bowel movement (6 days or 2 weeks apart), or how long he took a medication (3 days, 6 days, 2 weeks, or 3 weeks). The record is clear that Plaintiff's medical providers recognized his contradictory statements during the course of treating him, whether about the timing of his bowel movements or the manner in which products affected him, and tried different conservative methods to resolve his complaints, regardless of his inability to convey an accurate history of them. The record reflects that the medical providers exercised patience and restraint and researched some of the propositions that Plaintiff asserted–such as his adamant position that brand-name Metamucil was significantly different from generic psyllium. Dr. Petersen ordered several tests to make sure Plaintiff was not suffering from a serious medical condition, and the tests determined that he was not, with an open question of

whether he might benefit from a low dosage of Flagyl.

Assuming that Plaintiff has a chronic constipation problem that has not yet been detected on any examination, x-ray, or colonscopy to date, the record reflects that both the Metamucil and the substitute generic psyllium worked for Plaintiff for several months before he stopped taking it so that he could experiment with drug interactions. Because Plaintiff has failed to provide sufficient evidence that he can meet either the objective or the subjective prong of the deliberate indifference test, his claims against NP York, Dr. Bunt, and Dr. Petersen are subject to summary judgment. Plaintiff has not shown that he is confined under conditions that amount to cruel and unusual punishment.

### D.    *Kim Miller*

Kim Miller was the Correctional Medical Services Supervisor, who received, researched, and answered OCFs from inmates about medical care issues. She was involved in Plaintiff's care over several different periods of time. The Court will address the time period that is set forth in the Complaint, and then it will address later time periods for which Plaintiff could submit a supplemental complaint for alleged continuing violations if permitted by the Court.

In the Complaint, Plaintiff alleges that Kimberly Miller was deliberately indifferent when she denied his grievance of January 6, 2011, complaining that Dr. Bunt had prescribed Lactulose that made things worse, and that he had not been able to have a bowel movement in 19 days. He sought Metamucil or a product similar to it that is not Fiber-Lax; he wanted a fiber product, not a calcium-enriched product (Fiber-Lax contains

calcium). (Dkt. 39-4, pp. 1, 5.) Miller had responded that he had been seen and/or his file reviewed by a nurse practitioner, a doctor, and the regional medical director, who believed he was given proper treatment for constipation. He was ordered to send in a new HSR if he had increased problems, and he would be scheduled for a re-evaluation. (*Id.*)

Ms. Miller's Affidavit reflects that she reviewed the medical file and discussed Plaintiff's case with the medical providers before responding to the grievance. (Dkt. , p. 3.) Because it was clear that the medical providers were attempting to prescribe different medications to Plaintiff to address his constipation during this time period, and there is no evidence in the record demonstrating that they were deliberately indifferent to Plaintiff's condition, there is nothing in the record suggesting that Ms. Miller was deliberately indifferent to Plaintiff's condition. She further advised him to return to the medical unit for re-evaluation, if he deemed it necessary.

Similarly, as to the OCFs submitted on March 2 and March 7, there is nothing in the record suggesting that Ms. Miller was deliberately indifferent to a serious medical need. Rather, Ms. Miller researched why Plaintiff had not received the Miralax prescription, discussed it with Dr. Petersen (who changed the prescription to fiber capsules), and relayed that information to Plaintiff, along with the direction to increase his fluid intake and exercise. Ms. Miller did not have the medical expertise to override or question Dr. Petersen's direction, and Plaintiff has not shown that Ms. Miller made any decision with knowledge of, or in disregard of, an excessive risk to Plaintiff's health and safety.

The remainder of the record shows that Ms. Miller followed the instructions of the prison and the medical providers in instructing Plaintiff to resubmit HSRs when his language was disrespectful, in requiring him to use HSR forms to obtain further medical care, to answer Plaintiff's OCFs according to her job responsibilities rather than require the medical providers to answer them, and to follow the instructions of the medical providers, such as the requirement that Plaintiff agree to take a medication before it was ordered for him (as a result of his lack of compliance in the past).

Because Plaintiff has not met the objective or the subjective prong of the deliberate indifference analysis as to Kim Miller, she is entitled to summary judgment on all of Plaintiff's claims.

## OTHER PENDING MOTIONS

### 1.     Plaintiff's Motion for Physical Service Address of Jan Epp

Plaintiff has filed a Motion for Physical Service Address of Jan Epp. (Dkt 33.) The claims in such proposed Amended Complaints raise the same theories against the unserved defendants as those asserted against the appearing parties. Such claims, therefore, regardless of service of process, are also subject to dismissal and could not be saved by amendment. *See Columbia Steel v. Ahlstrom Recovery*, 44 F.3d 800, 802 (9th Cir. 1995) (upholding "dismissal with prejudice in favor of a party which had not yet appeared, on the basis of facts presented by other defendants which had appeared"); *Silverton v. Dep't of Treasury*, 644 F.2d 1341, 1345 (9th Cir. 1981) ("A District Court may properly on its own motion dismiss an action as to defendants who have not moved

to dismiss where such defendants are in a position similar to that of moving defendants or where claims against such defendants are integrally related."). Therefore, because Jan Epp would be entitled to summary judgment if she appeared and defended, this Motion is moot.

### 2. Plaintiff's Motions Regarding Discovery

Plaintiff filed an apologetic but inappropriate ex parte motion informing the Court of certain discovery disputes. (Dkt. 29.) Plaintiff also filed a Motion to Compel Discovery, on the same topic as the ex parte motion. (Dkt. 30.) Most recently, Plaintiff filed a Motion to Withdraw the Motion to Compel, for the reason that he did not first try to work out the discovery dispute with opposing counsel. (Dkt. 34.) Good cause appearing, the Motion to Withdraw will be granted, and the other two motions are moot. The Court notes that the parties' submissions in this case have been extensive, and no further discovery is necessary on either side to supplement the record before summary judgment.

### 3. Plaintiff's Motion for Extension of Time

Plaintiff requested additional time to file his Response to Defendants' Motion for Summary Judgment. (Dkt. 37.) Good cause appearing, the motion is granted, and Plaintiff's Response, filed on July 29, 2013, was given consideration in summary judgment decision.

# ORDER

**IT IS ORDERED:**

1.    Plaintiff's Motion for Service (Dkt. 33) is DENIED.

2.    Plaintiff's Ex Parte Motion (Dkt. 29) is MOOT.

3.    Plaintiff's Motion to Compel Discovery (Dkt. 30) is MOOT.

4.    Plaintiff's Motion to Withdraw the Motion to Compel (Dkt. 34) is
      GRANTED.

5.    Plaintiff's Motion for Extension of Time to File Response (Dkt. 37) is
      GRANTED. The Response filed at Docket No. 39 is considered timely
      filed.

6.    Defendants' Motion for Summary Judgment (Dkt. 35) is GRANTED.

7.    Plaintiff's Motion for Notice re: Suggestion of Death of a Defendant (Dkt.
      41) is MOOT, given that the entire case is subject to dismissal.

8.    Plaintiff's Complaint, and this entire cause of action, are DISMISSED with
      prejudice.

DATED:  **March 26, 2014**

Honorable B. Lynn Winmill
Chief U. S. District Judge